# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 17-cv-00029-STV

SONRISA HOLDING, LLC, and
LIVING TRUST AGREEMENT OF MELODY L. ORTEGA
DATED JANUARY 21, 2002,

      Plaintiffs,

v.

CIRCLE K STORES, INC.,

      Defendant.

_____

## ORDER
_____

Magistrate Judge Scott T. Varholak

      This matter comes before the Court on three motions for summary judgment: (1) Defendant's Motion for Partial Summary Judgment ("Defendant's MPSJ") [#63]; (2) Plaintiffs' Motion for Partial Summary Judgment ("Plaintiffs' MPSJ") [#64]; and (3) Defendant's Motion for Summary Judgment on Plaintiffs' Claims for Assigned Damages ("Defendant's Assigned Damages MSJ") [#73].  Also before the Court is Defendant's Submission of Affidavit of Troy R. Rackham in Support of Attorney Fees Awarded By Court (the "Fees Motion") [#82] (collectively, the "Motions").  The Motions are before the Court on the parties' consent to have a United States magistrate judge conduct all proceedings in this action and to order the entry of a final judgment.  [##24, 27]  This Court has carefully considered the Motions and related briefing, the entire case file, and the applicable case law, and has determined that oral argument would not materially assist in the disposition of the Motions, and accordingly **DENIES** Plaintiffs' Request for

Oral Argument on Outstanding Motion for Summary Judgment [#91].  For the following reasons, Defendant's MPSJ [#63] is **GRANTED in part and DENIED in part**, Plaintiff's MPSJ [#64] is **GRANTED in part and DENIED in part**, Defendant's Assigned Damages MSJ [#73] is **GRANTED in part and DENIED in part**, and Defendant's Fees Motion [#82] is **GRANTED in part and DENIED in part**.

## I.    BACKGROUND

This case arises out of a gasoline spill at a gas station owned by Defendant Circle K Stores, Inc. ("Circle K"), which migrated from Circle K's property onto adjacent properties owned by Plaintiffs Sonrisa Holding, LLC ("Sonrisa"), and the Living Trust Agreement of Melody L. Ortega Dated January 21, 2002 ("Ortega").  [*See generally* #1] Sonrisa's principal is Eugene Lucero.  [*See* #63 at 11; *see also generally* #63-15, #64-3] The undisputed facts are as follows.[1]

Ortega and Sonrisa each owned several properties in Denver, Colorado, collectively located at West 38th Avenue, Lowell Boulevard, and West Clyde Place (the "Impacted Properties").  [#72-1, SSOF1-2] Circle K owns and operates a retail gas station at 3600 West 38th Avenue in Denver (the "Gas Station"), where it buys, sells, and stores petroleum products, including gasoline.  [*Id.* at SSOF5-6]  On June 8, 2011, Circle K

---

[1] The undisputed facts are drawn from the Separate Statement of Facts filed with Defendant's MPSJ (the "Circle K Statement of Facts") [#71-1] and the Separate Statement of Facts filed with Plaintiffs' MPSJ (the "Sonrisa Statement of Facts") [#72-1]. The Court refers to the sequentially numbered facts set forth in the Circle K Statement of Facts as "CSOF#" and refers to the sequentially numbered facts set forth in the Sonrisa Statement of Facts as "SSOF#."  While Plaintiffs did not label each fact by number, the Court refers to each fact numerically by the order in which it appears.  Circle K did not submit a separate statement of facts with its Assigned Damages MSJ.  The Court occasionally cites directly to the exhibits or other filings cited by the parties to provide additional context.

reported a gasoline spill of approximately 100 gallons at the Gas Station to the Colorado Department of Labor, Division of Oil and Public Safety ("OPS"). [*Id.* at SSOF7; #71-1, CSOF3-4] There also have been historical release of gasoline and other petroleum products at the Gas Station. [#72-1, SSOF7] During the spill, petroleum products, released from underground storage tanks and associated piping at the Gas Station migrated onto portions of the Impacted Properties. [*Id.* at SSOF8-10] Plaintiffs did not give Circle K permission, approval, or authority to dispose or place the released petroleum products onto the Impacted Properties. [*Id.* at SSOF13]

Petroleum-related contaminants entered the groundwater at the Impacted Properties because of the spill. [*Id.* at SSOF14] Days after the spill, Circle K hired CGRS as its environmental consultant to perform cleanup procedures of the petroleum hydrocarbon contamination of the groundwater, including in areas underneath the Impacted Properties, and to determine the extent of the contamination and the appropriate corrective action. [*Id.* at SSOF11; #71-1, CSOF5-6] In October 2012, CGRS submitted a Corrective Action Plan to OPS, which called for a hydraulic fracturing procedure to neutralize the petroleum in the groundwater. [#71-1, CSOF7-8] OPS approved the Corrective Action Plan. [*Id.* at CSOF9] In March 2014, CGRS provided a letter to Plaintiffs on behalf of Circle K, explaining the cleanup procedures and requesting access to Plaintiffs' properties to sample the groundwater and perform the carbon injecting. [*Id.* at CSOF13-14] Plaintiffs agreed and gave CGRS access to their property for sampling and testing. [*Id.* at CSOF15]

In the meantime, beginning in December 2013, Plaintiffs had discussed potentially selling their properties to the developer Trammel Crow.[2] [*Id.* at CSOF12] In April 2014, Plaintiffs entered a contract to sell their properties to Trammel Crow. [*Id.* at CSOF16] Both Trammel Crow and Plaintiffs obtained environmental consultants. [*Id.* at CSOF17-19, 22] Trammel Crow hired Terracon as its environmental consultant, which recommended that a vapor intrusion barrier and mitigation system ("vapor barrier") be constructed at the Impacted Properties to remediate the petroleum contamination. [*Id.* at CSOF22; #72-1, SSOF19] The parties dispute at length whether the vapor barrier recommended by Terracon was necessary, and whether Plaintiffs' own environmental consultant concluded that such a barrier was required. [#71-1, CSOF22-23; #72-1, SSOF19-23] Ultimately, Trammel Crow required that the vapor barrier be constructed at the Impacted Properties. [#72-1, SSOF20]

In an amendment to the sales contract, Plaintiffs and Trammel Crow agreed that Sonrisa and Ortega would each place $150,000 of the proceeds from the purchase price in escrow (the "Environmental Escrow"), to fund the cost of addressing "any reasonable cost of Contamination Containment" at the Impacted Properties. [*Id.* at SSOF18; #71-1, CSOF26] On April 6, 2015, Trammel Crow requested a 90-day extension of the closing dates. [#71-1, CSOF29]

---

[2] The parties refer to different entities as the buyer in the sale at issue here. [*See, e.g.*, #71-1, CSOF12,16, 17; #72-1, SSOF3, 15] In Defendant's MPSJ, Circle K explains that Trammel Crow refers to three entities: Trammel Crow Residential, Maple Multi-Family Land, TX, LP—the entity Trammel Crow created to purchase the properties, and 38th Street Apartments, LLC—the entity Trammel Crow created to perform the development and to which the property was assigned. [#63 at 8 n.4] Circle K further explains that there is no dispute about the involvement and evolution of these entities. [*Id.*] The Court agrees, and for ease of reference refers to these entities in the collective as Trammel Crow, unless otherwise specified.

Ortega and Sonrisa sold their properties to Trammel Crow on May 22 and June 11, 2015, respectively. [*Id.* at CSOF39, 41; #72-1, SSOF3] Ortega was paid over $2,000,000 for its share of the property purchased by Trammel Crow, and Sonrisa was paid over $9,000,000 for its share. [#71-1, CSOF43-44] At closing, Ortega and Sonrisa each funded $150,000 into the Environmental Escrow for a total of $300,000, as required by the amendment to the sales contract. [*Id.* at CSOF40, 42] After Trammel Crow incurred the contamination containment expenses from constructing the vapor barrier proposed by Terracon, Plaintiffs were collectively refunded $116,790—the remaining balance from the Environmental Escrow. [*Id.* at CSOF46] Plaintiffs then sent a demand to Circle K for the remaining $183,210 used from the escrow account. [*Id.* at CSOF54]

In August 2018, Trammel Crow assigned to Plaintiffs its interest in any claims it had or could have against Circle K related to the remediation. [*Id.* at CSOF71-72] Through supplemental disclosures in September 2018, Plaintiffs indicated that they were seeking additional damages, including cost of capital damages, and damages based on the assignment from Trammel Crow. [*Id.* at CSOF84-85, 87] The claimed assigned damages include "dewatering costs" spent by Trammel Crow in 2015 and 2016 after the sales of the Impacted Properties had been completed. [*Id.* at CSOF88]

Plaintiffs identified a need for experts, including for damages, as well as an environmental consultant/engineer and an environmental transactional attorney, in the Scheduling Order [*id.* at CSOF58; *see also* #26 at 7], but did not identify any expert witnesses in their initial disclosures and never disclosed affirmative experts by the deadline [#71-1, CSOF60, 65]. At a discovery hearing on October 19, 2018, the Court denied a belated request from Plaintiffs to disclose a damages expert, and limited any

expert testimony by Plaintiffs to rebuttal expert testimony. [*See id.* at CSOF76-78; *see also* #56 at 26:9-31:25]

Plaintiffs initiated this action in January 2017 asserting trespass and nuisance claims and seeking to recover the $183,210 in expenses from the Environmental Escrow for which they were not reimbursed, among other damages. [#1 at 7-10; #71-1, CSOF56-57] The parties filed cross motions for summary judgment in January 2018. [##63, 64] Plaintiffs' MPSJ seeks summary judgment on the issue of liability on both the trespass and nuisance claims. [#64] In Defendant's MPSJ, Circle K argues that it is entitled to summary judgment on all of Plaintiffs' damages requests, except for nominal damages. [*See generally* #63] Specifically, Circle K seeks summary judgment on Plaintiffs' requests for remediation costs, transactional legal costs, cost of capital, assigned damages claims, lost opportunity damages, and noneconomic damages. [*Id.*] In Defendant's Assigned Damages MSJ, Circle K elaborates on its contention that it is entitled to summary judgment to the extent Plaintiffs seek assigned damages. [#73] The Motions are fully briefed. [##66-67, 71-72, 76-77] Circle K filed a supplemental brief in support of its MPSJ on May 2, 2019 [#78], Plaintiffs filed a response [#79], and Circle K filed a reply [#81]. On June 7, 2019, Plaintiffs filed a Request for Oral Argument on Outstanding Motions for Summary Judgment. [#91]

Meanwhile, on February 20, 2019, this Court held a hearing on Plaintiffs' Motion to Strike Affidavit of Julie Fraser [#57] and Defendant's Motion to Exclude Untimely Damage Claims and Other Sanctions [#61]. [#70] During the hearing, the Court ruled that Defendant could re-depose Mr. Lucero and that "[d]efense counsel shall be reimbursed the costs of the re[-]deposition of Mr. Lucero for up to four hours." [*Id.* at 3]

On May 23, 2019, Defendant filed the Fees Motion seeking $5,057.50 in fees, based upon 11.9 hours spent preparing for, traveling to and from, and taking Mr. Lucero's deposition, at a rate of $425 per hour. [#82; #82-1 at 2, 4] The Fees Motion also seeks $1,072.00 in transcription services. [*Id.*] Plaintiffs have responded to the Fees Motion [#86] and Defendant filed a reply [#92].

## II. STANDARD OF REVIEW

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Henderson v. Inter–Chem Coal Co.,* 41 F.3d 567, 569 (10th Cir. 1994). Where, as here, the Court is presented with cross-motions for summary judgment, the Court "must view each motion separately, in the light most favorable to the non-moving party, and draw all reasonable inferences in that party's favor." *United States v. Supreme Court of New Mexico*, 839 F.3d 888, 907 (10th Cir. 2016) (internal quotations omitted).

When the moving party bears the burden of persuasion at trial, "the moving party must establish, as a matter of law, all essential elements of the [claim on which summary judgment is sought] before the nonmoving party can be obligated to bring forward any specific facts alleged to rebut the movant's case." *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008). In other words, the moving party "must support its motion with credible evidence showing that, if uncontroverted, the moving party would be entitled to a directed verdict." *Rodell v. Objective Interface Sys., Inc.*, No. 14-CV-01667-MSK-MJW, 2015 WL 5728770, at *3 (D. Colo. Sept. 30, 2015) (citing *Celotex Corp.*, 477 U.S. at 331). "The

burden then shifts to the non-moving party to produce evidence demonstrating the existence of a genuine factual issue for trial." *Id.*

When the moving party does not bear the burden of persuasion at trial, the movant may satisfy its initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact "simply by pointing out to the court a lack of evidence . . . on an essential element of the nonmovant's claim." *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir.1998). If the movant carries this initial burden, the burden then shifts to the nonmovant "to go beyond the pleadings and set forth specific facts that would be admissible in evidence in the event of trial." *Id.* at 671 (quotation omitted).

"[A] 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury. *See Anderson,* 477 U.S. at 248–49; *Stone v. Autoliv ASP, Inc.,* 210 F.3d 1132, 1136 (10th Cir. 2000); *Carey v. U.S. Postal Serv.,* 812 F.2d 621, 623 (10th Cir. 1987). A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable party could return a verdict for either party. *Anderson,* 477 U.S. at 248. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (*citing First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

## III. Analysis

Plaintiffs assert two claims for relief: trespass and nuisance, caused by Circle K's petroleum products migrating from the Gas Station onto the Impacted Properties. [#1 at 7-10] The Court first addresses Plaintiffs' MPSJ, which asserts that Plaintiffs are entitled to summary judgment on liability for these two claims. [#64] The Court then addresses Defendant's MPSJ [#63] and Defendant's Assigned Damages MSJ [#73], and related briefing, which contend that Plaintiffs are not entitled to any damages relief, other than nominal damages, and cannot recover for remediation costs, transaction costs, cost of capital, assigned damages, lost opportunity damages, or noneconomic damages. [##63, 73] Where the motions for summary judgment overlap, the Court addresses the legal arguments together. *See Azzun v. Kan. Dep't of Health & Env't*, No. 09-4144-SAC, 2010 WL 4975557, at *1 (D. Kan. Dec. 2, 2010). Finally, the Court rules upon the Fees Motion. [#82]

### A. Trespass

Under Colorado law,[3] a trespass consists of the following elements: "a physical intrusion upon the property of another without the proper permission from the person legally entitled to possession of that real estate." *Pub. Serv. Co. of Colo v. Van Wyk*, 27 P.3d 377, 389 (Colo. 2001). "By intentionally entering the land possessed by someone else, or causing a thing or third person to enter the land, an individual becomes subject to liability for trespass, *whether or not he caused harm to any legally protected interest of the landowner.*" *Id.* (emphasis added); *see also Cook v. Rockwell Intl's Corp.*, 618 F.3d

---

[3] A federal court exercising diversity jurisdiction applies the laws of the forum state in analyzing the underlying state law claims. *See, e.g.*, *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Essex Ins. Co. v. Vincent*, 52 F.3d 894, 896 (10th Cir. 1995).

1127, 1148 (10th Cir. 2010) ("*Cook II*") (same). "[P]roof that the trespassory invasion caused actual damages is not required to establish liability, and the plaintiff is always entitled to recover at least nominal damages." *Cook v. Rockwell Int'l Corp.*, 273 F. Supp. 2d 1175, 1200 (D. Colo. 2003) ("*Cook I*"), *disapproved on other grounds on appeal*, 618 F.3d 1127 (10th Cir. 2010).

Here, the parties agree that there was a release of petroleum from the underground storage tanks at the Circle K Gas Station, and the petroleum from that release constituted a physical intrusion by migrating onto portions of the Impacted Properties, contaminating the groundwater. [#71-1, CSOF4; #72-1, SSOF8-10, 14; *see also* #64 at 3-4; #67 at 3] The parties also agree that Plaintiffs did not authorize the physical intrusion of the petroleum. [*See* #72-1, SSOF13; *see also* #64 at 4; #67 at 3] Accordingly, no disputed material issues of fact remain with respect to Circle K's liability for trespass.

Circle K nevertheless argues that Plaintiffs have failed to support their requested damages with adequate evidence or expert testimony. [*See generally* #67] Circle K "unequivocally disputes . . . that the petroleum migration proximately caused Plaintiffs to suffer any actual damages whatsoever" [*id.* at 4] and contends that Plaintiffs' failure to provide adequate damages evidence is fatal to their trespass claim [*id.* at 10]. But again, Plaintiffs are seeking summary judgment on liability, not damages, and damages are not

an element of a trespass claim.[4],[5]  *See Cook I*, 273 F. Supp. 2d at 1200; *Micale v. Bank One N.A. (Chicago)*, 382 F. Supp. 2d 1207, 1223 (D. Colo. 2005) ("Defendants are not entitled to summary judgment on Plaintiff's breach of contract claim . . . based on damages, because damages . . . are not an essential element of the claim."); *see also Meredith v. Int'l Marine Underwriters*, No. GLR-10-837, 2012 WL 3025139, at *11 (D. Md. July 20, 2012) ("Despite having stricken [plaintiff's] sole retained damages expert, the Court denies [defendant's] Renewed Motion for Summary Judgment, under its damages argument, because under Maryland law, damages is not an essential element of a claim for breach of contract.").  And, as Circle K recognizes [#67 at 10], Plaintiffs are at least entitled to nominal damages for their trespass claim even if they cannot ultimately recover any other categories of damages.  *See Sanderson v. Heath Mesa Homeowners Ass'n*, 183 P.3d 679, 684 (Colo. App. 2008) ("If the court finds that the [plaintiffs] did not present sufficient evidence of the actual damages incurred by them resulting from this trespass, it shall nevertheless award them nominal damages for [defendant's] trespass.").

---

[4] In contrast, a plaintiff asserting an *intangible* trespass claim, which could include an intrusion caused by noise, radiation, or electromagnetic fields, must prove physical damage to the property caused by that intangible intrusion.  *Pub. Serv. Co.*, 27 P.3d at 390; *see also Cook II*, 618 F.3d at 1148-49.  The parties do not dispute here that the petroleum migration onto the Impacted Properties was a physical intrusion and thus the traditional trespass elements apply.

[5] Moreover, when damages are not an element of the claim, a motion for summary judgment solely based on damages is not the appropriate procedural vehicle.  *See* Fed. R. Civ. P. 56(a) (authorizing a party to move for summary judgment on a "*claim or defense*—or the part of each claim or defense" (emphasis added)); *Asher Assocs., L.L.C. v. Baker Hughes Oilfield Operations, Inc.*, No. 07-cv-01379-WYD, 2009 WL 1468709, at *2 (D. Colo. May 20, 2009) (denying motion for summary judgment where defendant's motion was solely based on available categories of damages, because the motion both sought an advisory opinion that would not resolve a claim).

There is no genuine issue of material fact that the gasoline spill at Circle K's Gas Station, which caused petroleum contamination on at least a portion of Plaintiffs' Impacted Properties, constituted a trespass. Accordingly, Plaintiffs' MPSJ [#64] is **GRANTED** to the extent it seeks summary judgment on liability for the trespass claim. For the same reasons, Circle K's MPSJ [#63] and MSJ on Assigned Damages [#73] are **DENIED** to the extent they seek summary judgment on liability for Plaintiffs' trespass claim.

### B. Nuisance

Plaintiffs also argue that they are entitled to summary judgment on their nuisance claim. [#64 at 6-9] "A claim for nuisance is predicated upon a substantial invasion of a plaintiff's interest in the use and enjoyment of his property when such invasion is: (1) intentional and unreasonable; (2) unintentional and otherwise actionable under the rules for negligent or reckless conduct; or (3) so abnormal or out of place in its surroundings as to fall within the principle of strict liability." *Pub. Serv. Co.*, 27 P.3d at 391; *see also Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 886 (10th Cir. 2017) (same). Here, Plaintiffs' nuisance claim is predicated on Circle K's negligence. [#64 at 7; *see also* #1 at ¶¶ 43-44] Accordingly, Plaintiffs must not only demonstrate that Circle K unreasonably and substantially interfered with their use and enjoyment of the Impacted Properties, but also that Circle K breached a legal duty that proximately caused Plaintiffs' damages. *See* Restatement (Second) of Torts § 822 (noting that in addition to the necessary elements for a nuisance claim, a nuisance claim predicated on negligent conduct also must include the regular elements of a negligence cause of action); 1 State Env'l L. § 3:6 (2018) ("Because a finding of negligence requires a determination that a defendant's action is unreasonable, a nuisance action founded on negligence differs little from the usual tort

action based on negligence." (collecting cases)); *Milwaukee Metro. Sewerage Dist. v. City of Milwaukee*, 691 N.W.2d 658, 676, 681 (Wis. 2005) ("[N]egligence-based nuisance requires proof of causation, which may require expert testimony if falling outside the realm of ordinary experience and comprehension."). Indeed, Plaintiffs recognize the standard for a nuisance claim predicated on negligence in their MPSJ, arguing that Circle K had a duty to prevent conditions at the Gas Station from creating an unreasonable risk of harm to Plaintiffs' properties, breached that duty, as evidenced by the contamination on the Impacted Properties, and that the petroleum contamination "caused damages to Plaintiffs' property, as well as monetary damages that Plaintiffs' incurred in paying the buyer of the Impacted Properties for remediation of the contamination." [#64 at 8]

While the parties' briefing on the nuisance claim focuses on whether Circle K unreasonably and substantially interfered with Plaintiffs' use and enjoyment of the Impacted Properties [*id.* at 8-9; #67 at 11-13; #72 at 5-9], the central problem for Plaintiffs is that regardless of Circle K's unreasonable or substantial interference, Plaintiffs have failed to raise a genuine issue of fact with regard to causation and damages—elements necessary to their nuisance claim, which is based on negligence.[6] Accordingly, as discussed in detail below, Plaintiffs' MPSJ [#64] is **DENIED** to the extent it seeks summary judgment on liability for their nuisance claim, and Defendant's MPSJ [#63] is **GRANTED** to the extent it seeks summary judgment on Plaintiffs' nuisance claim.

---

[6] Although Circle K's briefing did not address this issue particularly clearly in the context of the nuisance claim, Circle K notes that its argument that Plaintiffs have failed to demonstrate damages, as presented with respect to the trespass claim, applies equally to Plaintiffs' nuisance claim. [#67 at 13]

### 1. Damages Categories Sought

Plaintiffs did not seek any specific damages in the Complaint, but rather stated that they sought "compensatory damages, interests, costs, and any other relief that this court deems just and proper." [#1 at 10] In the Proposed Scheduling Order, filed on March 2, 2017, Plaintiffs stated that they were seeking $183,210 in damages as a result of the cost of the vapor barrier, and $10,000 in "increased transactional legal fees." [#22 at 4] Through supplemental disclosures in September 2018, Plaintiffs indicated that they were seeking additional damages, including cost of capital damages, and damages based on the assignment from Trammel Crow. [#71-1, CSOF84-85, 87] In their Tenth Supplemental Disclosures on December 14, 2018, the deadline for discovery, Plaintiffs revealed that they would also be seeking damages related to lost opportunity costs and noneconomic damages. [*See id.* at CSOF91; *see also* #88 at 60:16-25] Circle K contends that it is entitled to summary judgment because Plaintiffs have failed to raise a genuine issue of material fact with respect to any category of damages: remediation damages, transactional legal expenses, cost of capital, assigned damages claims, lost opportunity damages, and noneconomic damages. [*See generally* ##63, 73, 78]

The Court considered whether to exclude certain categories of these damages under Federal Rule of Civil Procedure 37(c)(1) at a Motion Hearing on Defendant's Motion to Exclude Untimely Damage Claims and Other Sanctions [#61] on February 20, 2019 [#70]. The Court struck Plaintiffs' request for lost opportunity costs, and Ortega's alleged cost of capital damages. [*Id.* at 2-3] The Court allowed the assignment damages, the noneconomic damages, and the cost of capital damages as to Sonrisa to proceed, and ordered Sonrisa's principal, Mr. Lucero, to sit for an additional deposition regarding the

late-disclosed support for the cost of capital and noneconomic damages requests. [#88 at 81:12-21, 85:1-15] The Court further granted Circle K's request to depose a Trammel Crow Rule 30(b)(6) designee regarding Plaintiffs' claimed assigned damages. [*Id.* at 79:14-23, 81:12-21]

Counsel for Circle K took Mr. Lucero's second deposition on March 19, 2019 regarding cost of capital and noneconomic damages. [*See* #78 at 2] Following the second deposition, the parties filed supplemental briefing regarding cost of capital damages as to Sonrisa and noneconomic damages. [*See* ##78-79, 81] Circle K additionally filed its Assigned Damages MSJ on March 1, 2019. [#73]

Given the Court's ruling at the February 20, 2019 hearing, striking Plaintiffs' lost opportunity damages and Ortega's cost of capital damages [#70 at 2-3], Plaintiffs cannot seek these damages and cannot rely upon these damages to avoid summary judgment on their nuisance claim. The Court addresses the remaining damages categories in turn below: remediation damages, transactional legal expenses, Sonrisa's cost of capital, assigned damages claims, and noneconomic damages. The Court concludes that because Plaintiffs have failed to set forth evidence supporting any of their requests for damages, Plaintiffs have not raised a genuine issue of material fact on their claim for nuisance.

## 2. Remediation Damages

Plaintiffs first seek damages from the petroleum contamination on the Impacted Properties, including the "monetary damages that Plaintiffs' incurred in paying the buyer of the Impacted Properties for remediation of the contamination." [#64 at 8] Specifically, Plaintiffs seek to recover the $183,210 that Trammel Crow took from the Environmental

Escrow to construct the vapor barrier ("Remediation Damages"). [#71-1, CSOF22, 40, 42, 46, 54; #72-1, SSOF21-23] Circle K contends that it is entitled to summary judgment on Plaintiffs' request for Remediation Damages because Plaintiffs have failed to set forth evidence that the petroleum spill proximately caused the incurrence of the Remediation Damages.[7] [#63 at 4-5]

As discussed above, because Plaintiffs' nuisance claim is predicated on negligence, Plaintiffs must not only demonstrate that Circle K unreasonably and substantially interfered with Plaintiffs' use and enjoyment of the Impacted Properties, but also that Circle K breached a legal duty that proximately caused Plaintiffs' Remediation Damages.[8] A plaintiff's damages are limited to damages that are "the natural and probable result of the injury sustained by virtue of the tortious act." *Vanderbeek v. Vernon Corp.*, 50 P.3d 866, 872 (Colo. 2002) (quotation omitted). That is, the damages must be reasonably foreseeable. *See id.* "The exact or precise injury need not have been foreseeable, but it is sufficient if a reasonably careful person, under the same or similar circumstances would have anticipated that injury to a person in the plaintiff's situation might result from the defendant's conduct." *Id.* (quoting C.J.I.-Civ.3d 9:30). Though

---

[7] Circle K also seems to insinuate that Plaintiffs' Remediation Damages are barred by the statute of limitations, but Circle K does not elaborate on that theory and focuses its discussion on causation and damages. [*See* #63 at 3; *see also* #67 at 12-13] The Court limits its analysis accordingly.

[8] Plaintiffs argue that damages are not required to establish a trespass or nuisance claim. [#66 at 1-3] While the Court agrees that damages are not an element of a trespass claim, damages are an element of a nuisance claim premised on negligence. As Plaintiffs recognize in their own MPSJ, a negligent nuisance claim requires Plaintiffs to demonstrate all the elements of a regular negligence cause of action, including causation and damages. [*See* #64 at 8 (Plaintiffs arguing that the "petroleum contamination on Plaintiffs' properties caused damages to Plaintiffs' property, as well as monetary damages that Plaintiffs' incurred in paying the buyer of the Impacted Properties for remediation of the contamination")]

damages from negligence (in this case, nuisance based on negligence) can have multiple causes, "the chain of causation . . . may be so attenuated that no proximate cause exists as a matter of law." *Boulders at Escalante LLC v. Otten Johnson Robinson Neff & Ragonetti PC*, 412 P.3d 751, 762 (Colo. App. 2015) (quotation omitted).

It is in the Court's discretion to determine whether expert testimony is required to prove causation and damages. *Truck Ins. Exch. v. MagneTek, Inc.*, 360 F.3d 1206, 1214 (10th Cir. 2004) (citing *Oliver v. Amity Mut. Irrigation Co.*, 994 P.2d 495, 497 (Colo. App. 1999)). "Expert opinion testimony is admissible if it is relevant and reliable." *Cary v. Auto Ins. Co. of Hartford*, 838 F. Supp. 2d 1117, 1122 (D. Colo. 2011). Expert opinions are relevant if they would "assist the trier of fact to understand the evidence or to determine a fact in issue," and are reliable if the expert is qualified, his opinions are based on sufficient facts or data, and he employs reliable principles and methods. *Id.* (quoting Fed. R. Evid. 702). The Court engages in a "common-sense inquiry into whether a juror would be able to understand certain evidence without specialized knowledge." *United States v. Gutierrez de Lopez*, 761 F.3d 1123, 1136 (10th Cir. 2014) (quotations omitted).

Here, whether the petroleum spill at Circle K proximately caused the Remediation Damages is beyond the common knowledge and experience of a juror. While the parties agree that petroleum migrated onto at least a portion of the Impacted Properties, expert testimony is necessary to address issues such as the location and extent of the petroleum migration, the risk of vapor hazards, and the need for and cost of the vapor barrier system, as opposed to other mitigation efforts—all of which bear upon whether the Remediation Damages were the natural and probable consequence of the gasoline spill. None of these issues are within the common knowledge or experience of a juror. Experts are routinely

used under analogous circumstances. *See, e.g., Hall v. Conoco Inc.*, 886 F.3d 1308, 1317 (10th Cir. 2018) ("[T]he long-term carcinogenic effects of benzene exposure lie outside the ken of common experience, requiring expert testimony."); *Chevron Pipe Line Co. v. PacifiCorp*, No. 2:12-CV-287-TC, 2017 WL 5178279, at *2 (D. Utah Sept. 7, 2017) (allowing expert witness, who was a certified professional engineer and petroleum remediator, with extensive experience investigating and remediating sites with contaminant spills, to testify about the reasonableness of costs incurred by plaintiff in responding to an oil spill); *Bd. of Cty. Comm'rs of Kay v. Freeport-McMoran Copper & Gold, Inc.*, No. CIV-12-601-C, 2013 WL 7802172, at *1 (W.D. Okla. Sept. 9, 2013) ("Both Plaintiff and Defendants have hired expert witnesses to testify as to the presence of any contaminants in the remaining smelter residue, any risks such contaminants might pose, and any potential remedial action that must be taken."); *Valley View Angus Ranch v. Duke Energy Field Servs., LP*, No. CIV-04-191-D, 2008 WL 2329169, at *3-*12 (W.D. Okla. June 4, 2008) (parties' expert witnesses offered testimony regarding the nature and extent of the soil and groundwater contamination, the remedial actions taken to date, the need or lack thereof for additional remediation, and the associated costs); *see also Lowery v. City of Albuquerque*, No. 09-0457 JB/WDS, 2012 WL 1378522, at *21 (D.N.M. Apr. 9, 2012) (finding that the "danger of residual drug particles and the quantity necessary to present a health risk is not within the realm of ordinary experience" and therefore defendants would need "to present scientific evidence and expert testimony" (citing *Hollander v. Sandoz Pharm. Corp.*, 289 F.3d 1193, 1214 (10th Cir. 2002)); *Cary*, 838 F. Supp. 2d at 1122 ("How one tests for the presence of mold in a home, the results

of such testing, and how best to remediate mold if it is present, are subjects that are beyond the typical knowledge and experience of a lay juror.").

Moreover, despite their position taken in opposition to Defendant's MPSJ [#66], in other filings before the Court, Plaintiffs have acknowledged that damages and causation issues surrounding the installation of the vapor barrier—the source of the Remediation Damages—necessitate expert testimony. [*See, e.g.*, #26 at 7 (Plaintiffs identifying the following fields of expert testimony in the Scheduling Order: environmental consultant/engineer; environmental transactional attorney; damages expert); #57 at 5-6 (Plaintiffs arguing that OPS witnesses' opinion regarding that division's position on the vapor barrier was an expert opinion); #59 at 5-6 (Plaintiffs arguing that lay witnesses' opinion that OPS statutes and regulations do not require a vapor barrier were far beyond the realm of common experience and constituted expert testimony)]

Although the Remediation Damages, and cause of those damages, are beyond the common knowledge of a jury, Plaintiffs have failed to disclose an expert to testify about the Remediation Damages. The Court denied Plaintiffs' untimely request to disclose a damages expert in October 2018, when Plaintiffs sought to do so seven months after the deadline had elapsed. [#54; #56 at 26:21-30:1] And Plaintiffs readily admit that they have no expert to establish causation or damages here. [#66 at 11] Nevertheless, Plaintiffs argue that the "damages calculations do not require expert opinion, especially when Plaintiffs, as property owners, can testify as to the value of their property," and because "proving the vapor barrier was scientifically necessary is not required to show causation." [*Id.* at 11-12] The Court disagrees.

With respect to causation, even if the parties agree that the petroleum leak caused some level of contamination to the Impacted Properties, it is Plaintiffs' burden to further demonstrate that Circle K's responsibility extended to covering the Remediation Damages. *See Boulders*, 412 P.3d at 762. In other words, Plaintiffs must demonstrate that the Remediation Damages were reasonably foreseeable, and "result[ed] from the risks that made [Circle K's] conduct tortious." *Id.* If the petroleum leak from Circle K's Gas Station did not pose a vapor risk, or at least did not pose a risk requiring the vapor barrier, then Circle K did not proximately cause the Remediation Damages. Further illustrating this point, Mr. Lucero, Sonrisa's principal, acknowledged in his deposition testimony that the Environmental Escrow was proposed by Sonrisa itself, to rescue the sale with Trammel Crow. [#79-4 at 119:15-120:8] Without expert testimony, Plaintiffs cannot demonstrate that Circle K's contamination, rather than Plaintiffs' independent business decision to save the sales deal, was the proximate cause of the Remediation Damages. *See Truck Ins. Exch.*, 360 F.3d at 1214-16 (holding that without the excluded expert testimony, the plaintiff did not have sufficient evidence of causation to survive a motion for summary judgment in a products liability action). Therefore, contrary to Plaintiffs' reasoning, whether or not the vapor barrier was scientifically necessary because of the petroleum leak from Circle K's Gas Station bears directly on causation.

As to the Remediation Damages themselves, Plaintiffs are mistaken that they can simply offer lay testimony on the property value of the Impacted Properties, which they claim decreased because of the payment into the Environmental Escrow. [#66 at 6-9] The Tenth Circuit has held that testimony regarding the valuation of property, when it is "based on technical or specialized knowledge, . . . is excluded from the category of lay

opinion under Rule 701(c)." *James River Ins. Co. v. Rapid Funding, LLC*, 658 F.3d 1207, 1216 (10th Cir. 2011). In the *James River* case, the Tenth Circuit concluded that the witness' testimony on property value was based on technical or specialized knowledge because he had calculated depreciation, including accounting for the deterioration and neglect causing the building to be condemned, and had relied on his professional experience in real estate, and technical reports from an outside expert. *Id.* at 1214-15. Accordingly, the testimony was inadmissible as lay opinion testimony. Similarly here, any testimony with respect to the value of the Impacted Properties would be based on depreciation in value because of the contamination, which would involve technical reports or expertise on the nature and extent of the contamination, and the necessity, cost, and extent of the mitigation project. Any testimony regarding the land value would thus constitute expert testimony under Rule 702. *See id.*

In the absence of any expert testimony on causation or Remediation Damages, Plaintiffs have failed to present evidence to raise a genuine issue of material fact with respect to their request for Remediation Damages.

### 3. Transactional Legal Expenses

Plaintiffs next seek to recover the additional legal expenses that they incurred because of Circle K's contamination when they sold their properties. [*See* #66 at 9-11; *see also* ##66-3, 66-4] These costs include legal fees incurred from reviewing the Environmental Escrow documents, and negotiations during the sale based on the vapor barrier ("Transactional Legal Expenses"). [*See* ##66-3, 66-4] Circle K argues that Plaintiffs were required to disclose evidence of the $10,000 in Transactional Legal

Expenses, and to disclose an expert to testify to the necessity and reasonableness of those fees, but failed to do so here.  [#63 at 9]

In general, attorneys' fees are "not considered the 'legitimate consequences of the tort . . . sued upon,' and thus may not be recovered from the defendant in the action." *Stevens v. Moore & Co. Relator*, 874 P.2d 495, 496 (Colo. App. 1994) (quoting *Bunnett v. Smallwood*, 793 P.2d 157, 160 (Colo. 1990)).   However, if attorneys' fees are the "legitimate consequence" of the suit, proximately caused by the wrongful conduct, they are "deemed to be actual damages," and may be sought by the plaintiff.  *Guarantee Tr. Life Ins. Co. v. Estate of Casper*, 418 P.3d 1163, 1172 (Colo. 2018); *Stevens*, 874 P.2d at 496.  When attorneys' fees are considered damages, those fees "must be determined by the trier of fact and proven during the damages phase."  *Ferrell v. Glenwood Brokers, Ltd.*, 848 P.2d 936, 941 (Colo. 1993).  Here, in seeking the transactional legal expenses associated with the establishment of the Environmental Escrow and the vapor barrier, Plaintiffs seek to recover attorneys' fees as actual damages from Circle K's contamination.  [*See* #66 at 10 ("Had the properties not been contaminated, Plaintiffs would not have had to pay their attorneys to negotiate and draft documents related to the contamination, such as contract amendments and the escrow agreement.")]

Initially, though not addressed by the Parties, it appears that Plaintiffs have failed to properly plead their request for the Transactional Legal Expenses.  "[W]hen a party claims it has incurred attorney fees as foreseeable damages arising from" tortious conduct, "such fees are considered special damages, which must be pleaded in the complaint pursuant to C.R.C.P. 9(g)."  *Lawry v. Palm*, 192 P.3d 550, 569 (Colo. App. 2008) (collecting cases); *see also* Colo. R. Civ. P. 9(g) ("When items of special damages

are claimed, they shall be specifically stated."); Fed. R. Civ. P. 9(g) (same). Including a request for attorneys' fees "in a general prayer for relief does not plead special damages." *Lawry*, 192 P.3d at 569. Plaintiffs' Complaint here does not identify attorneys' fees as special damages incurred because of Circle K's conduct, and Plaintiffs would thus appear to be precluded from recovering those fees as damages. *Id.* [*See also* #1 at 10]

But, even if Plaintiffs were not precluded from seeking the Transactional Legal Expenses, Plaintiffs nevertheless failed to present evidence that those expenses were reasonable, or proximately caused by Circle K's conduct. *See Stevens*, 874 P.2d at 497; *see also Caldera Pharm., Inc. v. Bellows*, No. 10-222 JH/RHS, 2012 WL 13005319, at *8 (D.N.M. Dec. 21, 2012) (denying request for attorneys' fees as damages where plaintiff had presented no evidence that those fees were incurred because of defendant's alleged fraud). Moreover, the Transactional Legal Expenses are based on the Remediation Damages, as Plaintiffs seek to recover for legal services in connection with the Environmental Escrow and the construction of the vapor barrier. Thus, for the same reasons discussed in the Remediation Damages Section, Plaintiffs have failed to present evidence to raise a genuine issue of material fact with respect to their request for Transactional Legal Expenses.

### 4. Cost of Capital

Plaintiffs additionally seek cost of capital damages, which essentially amount to the additional credit card interest that Plaintiffs had to pay due to decreased solvency when Plaintiffs' funds were tied up in the Environmental Escrow. [*See* #66 at 13-15; #79 at 5; *see also* #88 at 63:1-7] With respect to Ortega's cost of capital damages, the Court struck these damages at the hearing on February 20, 2019, based on Plaintiffs' untimely

disclosures, which the Court concluded were prejudicial to Circle K. [*See* #70 at 2; *see also* #88 at 77:11-23]  Accordingly, Plaintiffs cannot rely on Ortega's cost of capital damages to defeat summary judgment on their nuisance claim, and the Court only addresses the cost of capital damages insofar as they are sought by Sonrisa.  In addition to the briefing on Defendant's MPSJ, the parties have filed supplemental briefing addressing the cost of capital damages following the second deposition of Mr. Lucero, Sonrisa's principal, ordered by the Court at the February 20, 2019 hearing.  [*See* ##78-79, 81]

Sonrisa apparently seeks $34,519.98 in cost of capital damages, consisting of interest expenses and charges for failing to timely pay bills and taxes after it deposited $150,000 into the Environmental Escrow. [*See* #78 at 2-4]  Circle K argues that "Sonrisa's decision to use high interest credit for expenses[—]rather than using some of the 4 million it received from closing[—]was the proximate cause of the losses."  [#71 at 9]  In other words, in Circle K's view, there is no causal connection between Sonrisa depositing $150,000 from the millions in sale proceeds, and Sonrisa later incurring interest charges on various credit cards and tax delinquency fees.  [#78 at 6]  Sonrisa responds that while the specific amounts of cost of capital damages may be in question, the fact of the damages is not speculative, and had Sonrisa had additional funds available, it would have been able to cover various expenses rather than taking out loans and lines of credit.  [#66 at 14-15; #79 at 3-5; #79-3]

The Court agrees with Circle K that Sonrisa's request for cost of capital damages fails because these damages were not proximately caused by Circle K's contamination of the Impacted Properties.  As discussed above, a plaintiff's damages are limited to

damages that are "the natural and probable result of the injury sustained by virtue of the tortious act." *Vanderbeek*, 50 P.3d at 872. The damages must be reasonably foreseeable, and though damages from a nuisance based on negligence may have multiple causes, "the chain of causation . . . may be so attenuated that no proximate cause exists as a matter of law." *Boulders*, 412 P.3d at 762.

For example, in *Boulders at Escalante LLC v. Otten Johnson Robinson Neff & Ragonetti PC*, the Colorado Court of Appeals held that a developer's claimed business losses, based on its decision not to sell certain units, were not proximately caused by its law firm's incorrect legal advice. 412 P.3d at 764-65. There, in the first action, the developer had been sued by its contractor, and the developer's law firm incorrectly advised that the developer's insurance policies would cover payment of any judgment against the contractor. *Id.* at 763. Operating under that understanding, the developer took several of its units off the market and was unable to sell them for a comparable value due to a housing market collapse about a year later. *Id.* at 765. The developer subsequently brought a legal malpractice action against the law firm for its incorrect advice in the first action. *Id.* at 755-57. The court concluded that the "direct harm risked by Law Firm's incorrect advice was the harm Developer might have suffered from its inability to recover the anticipated insurance proceeds" from the contractor. *Id.* at 765. "But Developer's business losses did not result from its inability to recover" the insurance proceeds, but rather "they resulted from Developer's decision to cancel existing sales contracts and take the units off the market." *Id.* In other words, "the link between Law Firm's incorrect advice, the consequent business decision by Developer [to sell the units],

and the real estate market collapse [wa]s too attenuated as a matter of law for Law Firm to be liable for the business losses that Developer sustained." *Id.* at 766.

A recent case from the Denver County District Court provides another helpful example, in a different context. In *Beta Computer Distribution Inc. v. Blue Fish Worx LP*, the plaintiff company had contracted with the defendant in early 2017 to purchase used computer equipment. No. 2017CV30621, 2018 WL 5732596, at *1 (Colo. Dist. Ct. July 22, 2018). The plaintiff determined that the goods were not in conformity with the contract and claimed $77,000 in damages caused by the loss of capital it had invested in the purchase. *Id.* at *1-*2. Included in that amount was $70,000 of the CEO's personal funds, which he was forced to use to pay off charges on the company's credit card for the purchase. *Id.* at *2. The plaintiff also contended that it had to forego numerous wholesale opportunities due to the illiquidity caused by the transaction with the defendant. *Id.* at *3. The court held that some of the losses were recoverable by the plaintiff because they were foreseeable at the time the parties entered into the contract, especially because the defendant company was aware of the need for capital reserves to participate in wholesale transactions "and the effect which a failed transaction significantly impacting its cash flow would have on a small company" like plaintiff's. *Id.* But the court found that the wholesale transactions that would have taken place more than a year after the contract with defendant were "not reasonably certain to have been caused by the unavailability of the $77,000 in capital" that the plaintiff had lost. *Id.* at *4. The court explained that it would have been reasonable for plaintiff to replenish its funds by 2017, given that $70,000 would have only represented approximately 1.1% of the company's gross revenues of $5.9

26

million.  *Id.*  Alternatively, the court noted that the plaintiff could have "arrange[d] for some species of debt financing to provide for its capital needs."  *Id.*

Likewise here, even assuming that the cost of capital damages claimed by Sonrisa could be attributed to that entity,[9] those damages were not proximately caused by the gasoline spill at Circle K's Gas Station.[10]  Instead, as in *Boulders*, they were proximately caused by independent business decisions of Sonrisa's principal, Mr. Lucero.  The parties

_____

[9] Sonrisa apparently admits that most of the cost of capital damages were incurred by Mr. Lucero personally, or one of his interrelated companies, but nevertheless argues that the expenses were ultimately the responsibility of Sonrisa.  [#79 at 3; #79-3 at ¶¶ 2-8]   The Court is not convinced that Mr. Lucero and his other entities are real parties in interest, entitled to claim cost of capital damages.  *See Gaven v. Malman*, 946 P.2d 558, 564 (Colo. App. 1997) ("[B]ecause any damages that could be recovered under the remaining claim belonged solely to the bankruptcy estate, we agree with the trial court's determination that plaintiff was not the real party in interest and that summary judgment should have entered on that basis.");  *see also Johnstown Feed & Seed, Inc. v. Cont'l W. Ins. Co.*, 641 F. Supp. 2d 1167, 1174 (D. Colo. 2009) (rejecting shareholders' argument that as shareholders of a closely-held corporation and managing agents of that corporation, they had an individual interest, separate from the corporate interest, sufficient to allow them to sue for the company's damages).  Additionally, Circle K argues that the only documents Sonrisa has produced that address charges directly attributable to Sonrisa, rather than to Mr. Lucero or his other entities, consist of 16 pages of Sonrisa's Business Gold Rewards account with American Express, with no explanation of those charges.  [#81 at 2; *see also* #81-1]  Mr. Lucero also claimed that a $40,000 architectural fee for a new building was attributable to Sonrisa, but that fee was not identified in any of the documents provided to Circle K.  [#78-1 at 8:9-23, 11:1-24]  Accordingly, the Court has additional concerns that Sonrisa has failed to comply with this Court's Order that Sonrisa provide documentation in support of the cost of capital damages [#70 at 2], and that Sonrisa has also failed to comply with the Federal Rules of Civil Procedure.  *See* Fed. R. Civ. P. 26(a)(1)(A)(iii) ("[A] party must . . . provide to the other parties . . . a computation of any category of damages claimed by the disclosing party—who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material . . . on which such computation is based.").  Even setting these issues aside, Sonrisa's request for cost of capital damages nevertheless fails for the reasons discussed below.

[10] Sonrisa argues that without Circle K's contamination, it would have never lost its use of capital, "some for a matter of time, and some permanently."  [#66 a 15]  But this argument goes to factual, not proximate, cause.  *See Boulders*, 412 P.3d at 765 ("[T]he business losses Developer suffered, although factually caused by Law Firm's negligence, did not result from the risks that made Law Firm's conduct negligent.").

do not dispute that Sonrisa was paid over $9 million by Trammel Crow at closing, and that after the closing, Mr. Lucero made the decision to invest virtually all the proceeds from the sale into new properties through a 1031 exchange. [#71-1, CSOF44-45, 48] Although Sonrisa argues at length about the extra $90,000 in cash it would have obtained, had none of the proceeds from the sale gone to the Environmental Escrow, the business decision to reinvest the vast majority of the sale from the proceeds was an intervening cause of Sonrisa's limited liquid capital after the sale. [*See, e.g.*, #78-1 at 44:21-45:23] As Mr. Lucero testified at his deposition, in the context of why he could not use funds from the sale to pay off personal expenses, "there were tens of thousands, hundreds of thousands of other expenses that were paid prior to [charges on his personal credit card] coming due." [*Id.* at 56:14-22] There is no evidence that these tens and hundreds of thousands of other expenses were caused by the gas contamination at the Impacted Properties, or the $150,000 originally placed by Sonrisa in the Environmental Escrow. [*See id.* at 17:20-18:4 (Mr. Lucero testifying that he was forced to borrow an additional $500,000 and then subsequently another $800,000 for his property investments)] Moreover, Mr. Lucero testified that at the time of closing of the sale to Trammel Crow, he was aware that he would need over $2 million for his new building project, including architectural fees. [*Id.* at 17:11-25] Other cost of capital damages were brought about by the intervening business decisions to put certain expenses on a credit card at a higher interest rate than another line of credit Mr. Lucero had available, to invest funds rather than pay credit card fees, and to incur late fees, including every month on certain accounts. [*Id.* at 16:13-17:10, 44:8-45:23, 54:19-23, 66:22-67:8; *see also* #81-1 (indicating several late charges on Sonrisa's American Express business account)]

The Court is also concerned by the extent to which Sonrisa is apparently willing to push the boundaries of acceptable cost of capital damages. [*See, e.g.*, #78-1 at 59:4-60:13, 80:16-81:7, 84:24-85:11 (Mr. Lucero testifying that Circle K should pay the interest incurred on charges for the following purchases: a Lexus, jazz club tickets, Colorado Rockies and Denver Nuggets tickets, a trip to Mexico, and a stay at a spa in New Mexico)] Mr. Lucero testified that Circle K should cover penalties for another one of his entities' failure to pay taxes on time because Mr. Lucero "didn't have the funds available to pay at the time because" he was deprived of those funds from the Environmental Escrow, and also that Circle K should be responsible for any interest on personal credit card charges, including purchases by Mr. Lucero's fiancée. [*Id.* at 55:15-56:9, 66:22-67:2] Again setting aside the fact that none of these damages were incurred by Sonrisa—the only one of Mr. Lucero's entities that is a plaintiff in the instant litigation—these charges are not the foreseeable consequence of a gasoline spill at Circle K's facility. The connection between the gasoline contamination from Circle K's facility and the cost of capital damages that Sonrisa seeks is far more attenuated than the improper legal advice and decision to take retail units off the market in *Boulders*.

Moreover, as in *Beta Computer*, the Court observes that the $150,000 that Sonrisa placed in the Environmental Escrow only amounted to 1.6% of the gross proceeds of the sale. By May 2016, Sonrisa had been refunded $59,000 of the $150,000 placed in the Environmental Escrow, so at that point, the capital no longer available to Sonrisa ($91,000) only constituted 1.01% of the gross proceeds. [*See* #78 at 4] Furthermore, Sonrisa's claimed cost of capital damages include charges from December 2016 [#78-1 at 11:20-24], and personal credit card expenses from 2017 [*id.* at 51:20-23]—long after

the sale when a portion of the proceeds were put into the Environmental Escrow. Like *Beta Computer*, transactions occurring over a year after the sale were "not reasonably certain to have been caused by the unavailability" of the $91,000 in capital that Sonrisa did not recover, especially because the unavailable capital ultimately only constituted 1.01% of the gross proceeds. *See* 2018 WL 5732596 at *4. And, unlike the costs of the foregone wholesale transactions that the court did allow the plaintiff to recover in *Beta Computer*, none of the cost of capital damages here are directly tied to Sonrisa business opportunities. *Cf. id.* at *3. In contrast to Mr. Lucero, the CEO of the plaintiff company in *Beta Computer* was attempting to recover his personal funds that were to be used directly to the company's benefit, in the development of future business partnerships and sales. *See id.* For the foregoing reasons, Sonrisa has failed to present evidence to raise a genuine issue of material fact with respect to its request for cost of capital damages.

### 5. Assigned Damages

Plaintiffs also seek assigned damages, based on the August 2018 assignment from Trammel Crow. [#71-1, CSOF71-72, 87] That assignment provided to Plaintiffs Trammel Crow's "interest in any claims [it] has, has had, or may have against Circle K Stores, Inc. related to the Remediation." [*Id.* at CSOF72] Specifically, Plaintiffs seek $42,960 for costs to remediate that were not reimbursed under the Environmental Escrow, including $29,000 in dewatering costs expended by Trammel Crow in February 2016, nearly a year after the sale from Plaintiffs to Trammel Crow had closed. [#73 at 2; *see also* #71-1, CSOF88; #76 at 9] Plaintiffs also seek $8,314.07 for Trammel Crow's costs to cover and haul away contaminated soil, $5,500 for costs paid by Trammel Crow to Family Environmental for consulting services, $10,785 for Trammel Crow's costs paid

to Terracon for the vapor barrier, and $8,728.45 in attorneys' fees for Trammel Crow's Rule 30(b)(6) deposition in this matter. [#73 at 2]

Circle K argues it is entitled to summary judgment on these damages because they are barred by the statute of limitations, because expert testimony is necessary to establish causation and Plaintiffs' entitlement to any of these damages, and because Plaintiffs were required to plead assigned damages in their Complaint under Federal Rules of Civil Procedure 8(a)(2) and 9(g). [*See* #63 at 15-17; #73 at 3-11] The parties address assigned damages in the briefing on Defendant's MPSJ [##63, 66, 71] and in the briefing on Defendant's Assigned Damages MSJ [##73, 76-77]

First, the Court notes that the request for attorneys' fees to cover Trammel Crow's Rule 30(b)(6) deposition is improper. Plaintiffs admit that these fees were billed directly to Plaintiffs and thus were never incurred by Trammel Crow, never assigned to Plaintiffs, and "are not relevant to the pending Motion." [#76 at 10] Moreover, "[i]n the absence of an express statute, court rule, or private contract to the contrary, attorney fees generally are not recoverable by the prevailing party in a contract or tort action." *Allstate Ins. Co. v. Huizar,* 52 P.3d 816, 818 (Colo. 2002). For these reasons, any request for attorneys' fees is improper here and Plaintiffs cannot rely on the attorneys' fees arising from the Trammel Crow 30(b)(6) deposition to defeat summary judgment.

With respect to the remaining assigned damages categories, all of these damages require expert testimony. Even assuming Plaintiffs' assigned damages were not barred by the statute of limitations, or by failing to plead under Rule 8 or Rule 9, Plaintiffs have not disclosed an affirmative expert and thus cannot prove causation or damages, for the

same reasons discussed in detail above in the Remediation Damages Section.[11] In short, it is beyond the common knowledge of the jury whether dewatering efforts, hauling away contaminated soil, and additional vapor barrier costs were the natural and probable consequence of the gasoline spill. Plaintiffs' own briefing underscores the need for expert testimony on this category of damages, and Plaintiffs failed to respond to Circle K's argument that expert testimony would be necessary to prove the assigned damages. [*See, e.g.*, #76 at 9 ("Plaintiffs' expert indicated in his report that it was reasonable for the developer to implement a vapor mitigation system across the entire footprint because of uncertainty about the level of benzene or its impact." (quotations omitted); *see also id.* at 9, n.4 (Plaintiffs citing to rebuttal expert's opinions on the need for the vapor barrier)] In the absence of any expert testimony on causation or assigned damages,[12] Plaintiffs have failed to present evidence to raise a genuine issue of material fact with respect to their request for assigned damages.

_____

[11] In fact, the assigned damages appear to be simply another form of Remediation Damages. [*See* #76 at 7 ("The assigned damages are comprised of costs to remediate the gasoline spill, including the costs of two environmental experts, dewatering costs, and costs to haul away contaminated soils.")]

[12] Again, Plaintiffs readily admit that they have no expert to establish causation or damages, and are not using their rebuttal expert, Wilmer E. Wilson, for such purposes. [#66 at 11] In allowing the untimely expert disclosure of Mr. Wilson, the Court had previously held that his testimony would be limited to rebuttal testimony. [#56 at 26:9-15] Thus, because Plaintiffs bear the burden of proof on the issue of causation of the assigned damages, Plaintiffs may not rely on Mr. Wilson to support their affirmative claims. *See Bleck v. City of Alamosa, CO*, No. 10-cv-03177-REB-KMT, 2012 WL 695138, at *4 (D. Colo. Mar. 5, 2012) (noting that a rebuttal expert's testimony is tied to whether the party with the affirmative burden has presented evidence and/or testimony from a duly disclosed expert on the same subject matter as that which will be rebutted by the rebuttal expert), *report and recommendation adopted* 2012 WL 764467 (D. Colo. Mar. 7, 2012); *see also UHS of Del., Inc. v. United Health Servs., Inc.*, No. 1:12-CV-485, 2017 WL 1945490, at *2 (M.D. Pa. May 10, 2017) (limiting improperly disclosed expert witnesses to rebuttal and prohibiting them from testifying in plaintiff's case in chief).

### 6. Noneconomic Damages

Finally, Plaintiffs seek noneconomic damages, apparently amounting to $38,248, for the stress associated with the contamination in this case, from March 2014, when Sonrisa was notified of the gasoline spill, through completion of the vapor barrier installation in October 2015.  [#63 at 20; #79 at 6]  The parties have addressed the issue of noneconomic damages in briefing on Defendant's MPSJ [#63 at 20; #66 at 18-19; #71 at 5-9], and in supplemental briefing on Defendant's MPSJ [#78 at 6-9; #79 at 5-7; #81 at 7-9], among other briefing on discovery disputes previously before the Court.

When a plaintiff has suffered an injury to real property, the plaintiff may be entitled not only to damages for any diminution of market value and restoration costs, but also for the damages of the loss of use of the land, and the discomfort and annoyance to the landowner as an occupant.  *Bd. Of Cty. Comm'rs of Weld Cty. v. Slovek*, 723 P.2d 1309, 1313, 1317-18 (Colo. 1986).  Loss of use of enjoyment damages can be recovered when the landowner is prevented from using his property, including from receiving rent or carrying on an economic enterprise.  *Id.* at 1317-18.  Damages for discomfort and annoyance can be recovered if the plaintiff presents evidence of "distress arising out of physical discomfort, irritation, or inconvenience caused by odors, pests, noise and the like."  *Webster v. Boone*, 992 P.2d 1183, 1185-86 (Colo. App. 1999).

In general, a legal entity such as a limited liability company "may not incur non-economic damages such as emotional stress or loss of enjoyment of life."  *Hill v. Boatright*, 890 P.2d 180, 185 (Colo. App. 1994) (citing *Earth Scientists, Ltd. v. U.S. Fid. & Guar. Co.*, 619 F. Supp. 1465 (D. Kan. 1985)), *aff'd in part*, *rev'd in part on other grounds sub nom.*, *Boatright v. Derr*, 919 P.2d 221 (Colo. 1996).  Because "a corporation lacks the

cognizant ability to experience emotions, a corporation cannot suffer emotional distress." *F.D.I.C. v. Hulsey*, 22 F.3d 1472, 1489 (10th Cir. 1994); *see also U.S. Welding, Inc. v. TECSYS, Inc.*, No. 14-cv-00778-REB-MEH, 2017 WL 4331061, at *6 (D. Colo. Aug. 24, 2017) ("[A]s a corporation, USW cannot seek noneconomic damages.").

However, several courts have suggested that corporations and other legal entities may be entitled to recover for the inconvenience, annoyance, and loss of use damages described above. *See, e.g.*, *Baltimore & Potomac P.R. Co. v. Fifth Baptist Church*, 108 U.S. 317, 329-30 (1883) (holding that the "right of the plaintiff to recover for the annoyance and discomfort to its members in the use of its property, and the liability of the defendant to respond in damages for causing them, are not affected by their corporate character," because "[w]hatever interferes with the comfortable use of [a private corporation's] property, for the purposes of their formation, is as much the subject of complaint as though the members were united by some other than a corporate tie"); *Acad. v. Ahmed*, No. 06 CV 1189, 2007 WL 5556292, at ¶ 6 (Colo. Dist. Ct. Apr. 24, 2007) (noting, in dicta, that corporate plaintiff could not recover for emotional distress, but suggesting that damages for discomfort and annoyance could be sought by the corporate entity); *Melching v. Eggert*, No. 2004 CV 1352, 2006 WL 4453800 (Colo. Dist. Ct. Aug. 8, 2006) (rejecting defendant's argument that corporation could not recover for loss of use and enjoyment, because loss of use had economic value, and because defendant's argument would have prevented corporate plaintiff and the individual plaintiff from recovering loss of use damages altogether); *City of Tulsa v. Tyson Foods, Inc.*, 258 F. Supp. 2d 1263, 1303 (N.D. Okla. 2003) (finding that although inconvenience and annoyance are injuries to the person and not to the property, "it does not necessarily follow that only natural persons

can recover damages for such injuries" and corporations may be entitled to such damages (citing G*us Blass Dry Goods Co. v. Reinman & Wolfort*, 143 S.W. 1087 (1912)), *vacated pursuant to settlement* (July 16, 2003).

Applied here, while Plaintiffs as legal entities cannot recover for the emotional stress associated with the contamination, they could theoretically recover damages for loss of use and enjoyment, and/or for annoyance and discomfort at the Impacted Properties.[13] However, Plaintiffs have failed to present sufficient evidence to raise a genuine issue of fact with respect to loss of use and enjoyment, or annoyance damages. First, the Court notes that Plaintiffs have cited to very minimal evidence of noneconomic damages—the Court could only locate two citations to the record that could potentially support noneconomic damages here. [#79 at 6] *See, e.g.*, *Gross v. Burggraf Const. Co.*, 53 F.3d 1531, 1546 (10th Cir. 1995) (holding that to withstand a summary judgment motion, the nonmovant must identify sufficient evidence pertinent to the material issue "by reference to an affidavit, a deposition transcript or a specific exhibit," and the court "will not search the record in an effort to determine whether there exists dormant evidence which might require submission of the case to a jury" (quotation omitted)); *see also S.E.C.*

---

[13] The Court is not persuaded by Circle K's arguments to the contrary. First, the Court is unaware of any case law from Colorado state courts or this District defining "person" as that term is used in Colo. Rev. Stat. § 13-21-102.5, and is therefore unwilling to restrict that definition to natural persons, especially considering the cases cited above. *See* Colo. Rev. Stat. § 13-21-102.5(2)(b) ("'Noneconomic loss or injury' means nonpecuniary harm for which damages are recoverable by the person suffering the direct or primary loss or injury, including pain and suffering, inconvenience, emotional stress, and impairment of the quality of life."). Second, evidence of a physical injury is not required to recover damages for discomfort or inconvenience. *See, e.g.*, *Bickerstaff v. Halliburton Energy Servs., Inc.*, No. CIV-11-1305-M, 2015 WL 3646136, at *3 (W.D. Okla. June 10, 2015); *Bolin v. Cessna Aircraft Co.*, 759 F. Supp. 692, 718 (D. Kan. 1991). But Plaintiffs' claims for noneconomic damages fail regardless, for the reasons discussed herein.

*v. Capital Holdings, L.L.C.*, No. 03-cv-00923-REB-CBS, 2006 WL 1660541, at *1 (D. Colo. June 12, 2006) (noting it is movant's duty "to specifically set forth the facts and law that arguably entitle him to relief," and the Court is "neither required nor inclined to peruse the record in this case in search of evidence that might support his motion"). Plaintiff Ortega has presented no evidence of noneconomic damages, and it is unclear if Ortega is even continuing to seek these damages.[14]

As to Sonrisa, Plaintiffs indicate that Mr. Lucero is seeking damages "for the stress associated with the pollution" and Mr. Lucero described that stress and his inability to sleep. [#79 at 7; *see also* #78-1 at 87:1-89:7, 90:2-8, 19-23] Again, because a limited liability company cannot experience emotions, Sonrisa cannot recover for noneconomic damages predicated on stress. Sonrisa also has failed to present sufficient evidence to raise a genuine issue of fact with respect to loss of use and enjoyment, because there is no evidence that Sonrisa was prevented from using its property, receiving rent, or continuing its business endeavors. *See Slovek*, 723 P.2d at 1317-18. To the contrary, it appears that Sonrisa continued to operate during and after the contamination. [*See, e.g.*, #79-4 at 84:17-24]

Finally, as to damages for discomfort and annoyance, Sonrisa's request for damages also fails. Initially, though the parties do not address the issue, it is unclear whether Mr. Lucero would qualify as an occupant of the property, and a nonoccupant owner generally can only recover "for the objective measure of the loss of rental value,"

---

[14] Plaintiffs did not respond to Circle K's argument that Ortega was not seeking noneconomic damages. [#78 at 7] The Court also noted at the February 20, 2019 hearing that it was unclear whether noneconomic damages were being sought by Ortega. [#88 at 73:9-12] Plaintiffs have not attempted to resolve this confusion.

and not "for any annoyance or discomfort suffered by reason of the property damage." *Slovek*, 723 P.2d at 1317. Nevertheless, Plaintiffs cite to Mr. Lucero's testimony that "a couple of [his] sales associates had . . . said that they smelled gas." [#79-4 at 84:22-24] Assuming Mr. Lucero qualified as an occupant of the Impacted Properties, and that the comments of the sales associates about the smell of gas could be attributed to Mr. Lucero and Sonrisa, these offhand remarks do not give rise to the type of distress from odors supporting a damages request for discomfort and annoyance, and Mr. Lucero also testified that there were no complaints from neighbors after the contamination. [*Id.* at 84:14-17] Plaintiffs also highlight Mr. Lucero's testimony that "even to this day, [he is] having to deal with explanation of the environmental issues that unfortunately are attached to this property," including providing environmental history reports, and acquiring permanent financing. [*Id.* at 120:25-121:20] The Court finds that explaining the environmental history at the Impacted Properties is not the kind of "physical discomfort, irritation, or inconvenience" resulting from "odors, pests, noise and the like" necessary for discomfort and annoyance damages. *See Webster*, 992 P.2d at 1185-86. Moreover, Sonrisa indicates that it is seeking noneconomic damages from March 14, 2014, when it became aware of the spill, through October 25, 2016, when the vapor barrier installation was completed. [#63 at 20; #79 at 6] The difficulties with permanent financing of Mr. Lucero's building, and at least some of the occasions Mr. Lucero has had to provide environmental reports, occurred after October 25, 2016. [#79-4 at 121:12-22 (Mr. Lucero, testifying in November 2018, that he had signed documents the day before as part of the permanent financing process, and was going to provide environmental reports to the

banks)]  For the foregoing reasons, Plaintiffs have failed to meet their burden to present evidence raising a genuine issue of fact as to noneconomic damages.

### 7.  Conclusion

Because Plaintiffs have not presented sufficient evidence of any of the foregoing categories of damages, Plaintiffs have failed to raise a genuine issue of material fact on damages—an essential element of their nuisance claim predicated on negligence. Accordingly, Defendant's MPSJ [#63] is **GRANTED** to the extent it seeks summary judgment on Plaintiff's nuisance claim.  *See Squires ex rel. Squires v. Goodwin*, 829 F. Supp. 2d 1041, 1061 (D. Colo. 2011) ("In the absence of any evidence, save for the inadmissible opinions of [the expert], Plaintiff has failed to raise a genuine issue of material fact that would warrant proceeding to trial on her [claims]."  (collecting cases)). For the same reasons, Plaintiffs' MPSJ [#64] is **DENIED** to the extent it seeks summary judgment on liability for their nuisance claim.  Furthermore, Defendant's MSJ on Assigned Damages [#73] is **GRANTED** to the extent its seeks summary judgment on Plaintiff's nuisance claim.

The Court finally notes that Circle K seeks costs in filing motions and supplemental briefing on cost of capital and noneconomic damages.  [#78 at 9-11]  Circle K argues that Plaintiffs have "dogged[ly] pursu[ed] . . . damages they knew did not belong to Sonrisa, were not part of the assignment, or otherwise were not recoverable," and seeks an award of sanctions "in an amount ample to compensate Circle K for defending these claims, which can be established on application."  [*Id.* at 12]  Because the Court concluded that Plaintiffs could have theoretically recovered damages for loss of use and enjoyment,

and/or for annoyance and discomfort at the Impacted Properties, the Court will not allow Circle K to seek sanctions or costs as to noneconomic damages briefing.

### C. Fees Motion

Through the Fees Motion, Defendant is seeking $5,057.50 in fees, based upon 11.9 hours spent preparing for, traveling to and from, and taking Mr. Lucero's deposition, at a rate of $425 per hour. [#82; #82-1 at 4] As set forth in the Court's Minute Order from the February 20, 2019 hearing, the Court intended to limit any fees in re-deposing Mr. Lucero to four hours. [#70 at 3; *see also* #88 at 86] The Court maintains this limitation here today, and will thus award Defendant attorney's fees of $1,700, which reflects four hours at a rate of $425 per hour.[15] The Court will further award $1,072, the cost of transcription services. [#82-1 at 4] The Court thus **GRANTS** the Fees Motion to the extent it seeks fees and costs of $2,772, but **DENIES** the Fees Motion to the extent it seeks any additional sums.

### IV.    CONCLUSION

For the foregoing reasons, Plaintiffs' MPSJ [#64] is **GRANTED in part and DENIED in part**, Defendant's MPSJ [#63] is **GRANTED in part and DENIED in part**, and Defendant's Assigned Damages MSJ [#73] is **GRANTED in part and DENIED in part**. The Fees Motion [#82] is **GRANTED in part and DENIED in part**. More specifically, the Court holds as follows:

(1)    Plaintiffs' Motion for Partial Summary Judgment [#64] is **GRANTED** as to liability on the trespass claim but **DENIED** as to liability on the nuisance claim.

---

[15] Plaintiff did not challenge the reasonableness of the rate, and the Court likewise finds it reasonable.

(2)     Defendant's Motion for Partial Summary Judgment [#63] is **DENIED** as to liability on the trespass claim, but **GRANTED** with respect to Plaintiffs' nuisance claim.

(3)     Defendant's Motion for Summary Judgment on Plaintiffs' Claims for Assigned Damages [#73] is **DENIED** as to liability on the trespass claim, but **GRANTED** with respect to Plaintiff's nuisance claim.

(4)     Defendant's Submission of Affidavit of Troy R. Rackham in Support of Attorney Fees Awarded By Court [#82] is **GRANTED** to the extent it seeks fees and costs of $2,772, but **DENIED** to the extent it seeks any additional sums.

(5)     The Motion Hearing set for July 1, 2019 at 1:30 p.m. [#83] is converted to a status hearing.

DATED:  June 12, 2019                    BY THE COURT:

                                         s/Scott T. Varholak
                                         United States Magistrate Judge